United States District Court
Southern District of Texas
**ENTERED**
August 02, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JEWELL THOMAS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00152 |
| | § | |
| JERRY SANCHEZ, *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Jewell Thomas, appearing *pro se* and *in forma pauperis*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. This case has been referred to the undersigned for all pretrial purposes. As discussed below, the undersigned recommends DENIAL of Plaintiff's first and third motions for emergency injunctive relief (Doc. Nos. 29, 44) and his motions for rehearing and for an additional evidentiary hearing. (Doc. Nos. 49, 53.)

Plaintiff filed a motion for emergency injunctive relief. (Doc. No. 29.) On June 29, 2023, the undersigned conducted an evidentiary hearing on Plaintiff's motion. On June 30, 2023, the undersigned denied Plaintiff's second motion for emergency injunctive relief as unnecessary, because its allegations were the same as those raised in Plaintiff's first motion. (Doc. Nos. 38, 39.) On July 10, 2023, the Court received Plaintiff's third motion for emergency injunctive relief, to which he attached numerous exhibits. (Doc. No. 44.) The undersigned recommends that Plaintiff's first and third motions for emergency injunctive relief (Doc. Nos. 29 and 44) be DENIED. In addition, the undersigned recommends that Plaintiff's motion for rehearing (Doc. No. 49) be DENIED without prejudice as premature and that Plaintiff's motion

for an additional evidentiary hearing (Doc. No. 53) be DENIED without prejudice as unnecessary.

### A. Background.

#### 1. Plaintiff's 42 U.S.C. § 1983 action.

Plaintiff is a prisoner in the Texas Department of Criminal Justice – Correctional Institutions Division (TDCJ-CID) and is housed at the McConnell Unit in Beeville, Texas. Plaintiff's allegations in this case arise in connection with his current housing assignment.

In this action, Plaintiff sues the following defendants: (1) McConnell Unit Warden Jerry Sanchez ("Warden Sanchez"); (2) McConnell Unit Medical Director Dr. Isaac Kwarteng ("Dr. Kwarteng"); (3) TDCJ-CID Director Bobby Lumpkin ("Director Lumpkin"); and (4) the State of Texas ("State") (collectively, "Defendants").  Plaintiff originally asserted claims under the Eighth Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A), and the Rehabilitation Act (RA), 29 U.S.C. § 794.

Plaintiff generally claims that Defendants violated his constitutional, ADA, and RA rights by failing to provide air conditioning in his living area, as Plaintiff was allegedly susceptible to excessive heat conditions because of his numerous alleged medical and mental health disabilities.  (Doc. No. 1, p. 9.)[1]  Plaintiff seeks monetary relief and injunctive relief in the form of being moved to air-conditioned housing.  *Id.* at 7; Doc. No. 20, pp. 1, 22; Doc. No. 18, pp. 60-61.  The Court has retained the following claims in this case: (1) Plaintiff's Eighth Amendment deliberate indifference claims against Dr. Kwarteng in his individual capacity for monetary relief

---

[1]  For purposes of identification, all page numbers refer to the pagination imprinted at the top of the page by the court's Electronic Case Filing system ("ECF"), including the evidentiary hearing transcript.

and in his official capacity for injunctive relief; and (2) ADA and RA claims against the State

and against Dr. Kwarteng, Warden Sanchez, and Director Lumpkin in their official capacities.

(Doc. Nos. 20, 27.)

### 2. *Plaintiff's first motion for emergency injunctive relief, and Defendants' response.*

Plaintiff requests emergency preliminary injunctive relief, seeking transfer to air-

conditioned housing.  (Doc. No. 29.)  Plaintiff contends that prison officials are not complying

with TDCJ's Administrative Directive 10.64 (AD-10.64), which according to Plaintiff directs

them to provide certain respite measures in excessive heat conditions to inmates upon request.

*Id.* at 1.  Plaintiff states that he filed a Step 1 grievance (Grievance No. 2023093951), dated April

15, 2023, complaining that he continues to suffer from the excessive heat in his living area due to

his disabilities and impairments.  *Id.* at 1-2.

According to Plaintiff, his diabetes condition causes his body to fight to stay hydrated,

and he is unable to sweat properly.  *Id.* at 2-3.  Because of the extreme heat conditions, Plaintiff

states, he suffers from chest pains, fatigue, dizziness, trouble concentrating, thinking, and

reading, as well as heat cramps, lightheadedness, and heart palpitations.  *Id.* at 3.  Plaintiff further

states that his "schizoaffective disorder mixed with the excessive indoor temps in [his] living

area impairs [his] thermoregulatory system."  *Id.*

Plaintiff further complains that: (1) Director Lumpkin has directed his subordinates not to

comply with AD-10.64 and allow Plaintiff access to unlimited iced cold water and cold showers

upon request; and (2) security officials have failed to conduct wellness checks as required by

AD-10.64.  *Id.*  Plaintiff believes he is not on a "heat restricted list" even though he suffers from

heat-related medical conditions.  *Id.*

On June 15, 2023, the Court directed Defendants to file a response, including any affidavits or other evidence, to Plaintiff's motion seeking emergency preliminary injunctive relief.  (Doc. No. 30.)  Defendants filed their response on June 20, 2023.  (Doc. No. 31.)  Rather than address the elements for establishing preliminary injunctive relief, however, Defendants argue that Plaintiff lacks standing for such relief.  *Id.* at 2.  According to Defendants, Plaintiff has failed "to show any actual or imminent injury as a result of exposure to heat" or "provide any evidence showing that there was a delay of denial of medical treatment for heat exposure."  *Id.*  Defendants further quibble with Plaintiff's failure to identify the grievance number filed on April 15, 2023, asserting also that the grievance was submitted on April 17, 2023.  *Id.* at 3.

### 3.  *The evidentiary hearing.*

On June 29, 2023, the undersigned conducted an evidentiary hearing on Plaintiff's motion for preliminary injunctive relief.  (Doc. No. 40.)  The parties presented the following evidence at the hearing:

- Plaintiff's testimony (*id.* at 8-46);

- Testimony of Dr. Jane Leonardson ("Dr. Leonardson") (*id.* at 47-59);

- Testimony of Warden Sanchez (now a TDCJ Regional Director) (*id.* at 60-75);

- Testimony of Dr. Kwarteng (*id.* at 77-114);

- Testimony of current McConnell Unit Warden Elbert Holmes ("Warden Holmes")[2] (*id.* at 115-38); and

- Defendants' Exhibits, consisting of:

---

[2]  Warden Holmes's first name was misspelled in the evidentiary hearing transcript as "Albert."  (Doc. No. 40, p. 115).

Ex. A          AD-10.64 (Doc. No. 42);

Ex. B          Heat Scoring Sheet (Doc. No. 42-1);

Ex. C          Plaintiff's List of Medical Conditions (Doc. No. 42-2);

Ex. D          Plaintiff's Medical Records (Doc. No. 42-3);

Ex. E          Heat Restriction List (Doc. No. 42-4); and

Ex. F          Plaintiff's Step 1 grievance (Doc. No. 42-5).

### 4.  Plaintiff's third motion for emergency injunctive relief and Defendants' response.

On July 10, 2023, the Court received Plaintiff's third motion for emergency injunctive relief.  (Doc. No. 44.)  Plaintiff attached to this motion numerous exhibits as evidence to support his contention that he was diagnosed with schizophrenia by a "free-world" psychiatrist and that he suffers to this day with schizophrenia.  (Doc. No. 44-3.)  Plaintiff's attached exhibits consist of the following (Plaintiff's descriptive labels used):

- Plaintiff's "Free-World Psychiatrist Information, Schizophrenia Diagnosis, and a 'Limited List' of Schizophrenia related prescribed medications" (Doc. 44-3, pp. 1-15);

- Plaintiff's "Sick Calls to the Mental Health Team Concerning the Plaintiff's Schizophrenia Diagnosis" (Doc. 44-3, pp. 16-40);

- "Clinical Notes Concerning Plaintiff's Diagnosed Schizophrenia: (Doc. 44-3, pp. 41-58); and

- "Sick Call Request to Defendant [Dr.] Kwarteng and His Response" (Doc. 44-3, pp. 59-63).

Defendants contend in their response that none of the new evidence provided by Plaintiff entitles him to injunctive relief.  (Doc. No. 54.)  Defendants argue that Plaintiff's free-world medical records appear to span from 2018 to 2020, that the records show that, at best, Plaintiff may have exhibited signs of schizophrenia or was complaining of schizophrenia, and that the evidence is unclear whether Plaintiff was ever diagnosed in the free world with schizophrenia. *Id.* at 2.  Defendants argue further that none of the additional medical records show that medical providers from the University of Texas Medical Branch ("UTMB") diagnosed Plaintiff with having schizophrenia or treated Plaintiff for schizophrenia during his current incarceration in the TDCJ.  *Id.* at 2-3.  While acknowledging that Plaintiff included a 2019 medication list, and that some of those listed medications are used to treat schizophrenia, Defendants maintain that the UTMB medical records submitted by Plaintiff fail to show that he is currently prescribed medication for schizophrenia or that he was ever diagnosed with schizophrenia.  *Id.* at 3-4.

### B.  Legal standard.

A federal court may grant a preliminary injunction "to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."  *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (restating and agreeing with the district court's framework in determining whether to grant a preliminary injunction).  A court should grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) if the movant establishes the following: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if [it] is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Robinson*

*v. Hunt Cnty., Tex.*, 921 F.3d 440, 451 (5th Cir. 2019) (quoting *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006)).

The Fifth Circuit has cautioned that granting a preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion."  *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)); *see also Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.").

In cases involving prisoners, courts are particularly reluctant to grant requests for a preliminary injunction, as "judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration."  *Wagner v. Campuzano*, No. 1:12-CV-205-C, 2013 WL 12147778, at *1 (N.D. Tex. May 31, 2013) (citing *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995)).  And the Prison Litigation Reform Act (PLRA) instructs that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).

### C.  Discussion.

#### 1.  Plaintiff fails to establish a substantial likelihood of success on the merits of his Eighth Amendment claim against Dr. Kwarteng.

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the

conditions under which he is confined are subject to scrutiny under the Eighth Amendment."
*Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (quoting *Woods v. Edwards*, 51 F.3d 577,
581 (5th Cir. 1995) (per curiam) (internal quotations omitted)).  Prison officials must provide
humane conditions of confinement and ensure that inmates receive adequate food, clothing,
shelter, and medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Conditions that result
in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the
minimal civilized measure of life's necessities" violate the Eighth Amendment.  *Rhodes v.
Chapman*, 452 U.S. 337, 347 (1981); *see also Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992).

Extreme temperatures in prison can violate the Eighth Amendment.  *Yates v. Collier*, 868
F.3d 354, 360 (5th Cir. 2017); *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015); *Gates v. Cook*,
376 F.3d 323, 333 (5th Cir. 2004).  "To be tantamount to the infliction of cruel and unusual
punishment, prison conditions must pose an unreasonable risk of serious damage to a prisoner's
health—an objective test—and prison officials must have acted with deliberate indifference to
the risk posed—a subjective test."  *Ball*, 792 F.3d at 592 (internal quotation marks omitted)
(affirming holding that Eighth Amendment was violated when prisoners who were being treated
for hypertension and diabetes were held in very hot cells without sufficient access to heat-relief
measures); *see Webb v. Livingston*, 618 F. App'x 201, 208–09 (5th Cir. 2015) (affirming holding
that inmates with heat-sensitive medical conditions who were housed in cells where the
temperature exceeded 100 degrees had asserted facts that, if proven, would overcome qualified
immunity).  "Without the requisite proof of both subjective and objective components of an
Eighth Amendment violation, however, merely 'uncomfortable' heat in a prisoner's cell does not
reflect a 'basic human need that the prison has failed to meet' and is not constitutionally
suspect."  *Id*. 792 F.3d at 592 (citing *Woods*, 51 F.3d at 581).

Plaintiff has failed to establish a substantial likelihood of success with respect to his deliberate indifference claim against Dr. Kwarteng regarding the allegedly excessive heat conditions in his living area.  As discussed in detail below, the evidence presented at the hearing fails to satisfy both the objective and subjective tests to show that Plaintiff's Eighth Amendment rights have been violated.

### a. Plaintiff has not shown a substantial risk of serious injury or death as a result of the heat conditions at the McConnell Unit.

To demonstrate that prison conditions impose an unreasonable risk of serious damage to a prisoner's health under the objective test, an inmate need not show that a death or serious injury already has occurred, but rather that there is a "substantial risk of serious harm."  *Ball*, 792 F.3d at 593 (citing *Gates*, 376 F.3d at 333).  "The Fifth Circuit has found extreme heat in prisons to violate the Eight Amendment when insufficient mitigation measures are used."  *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017) (Ellison, J.) (citing *Ball*, 792 F.3d at 584 and *Gates*, 376 F.3d at 339).

In *Ball*, the Fifth Circuit listed several heat mitigation measures that prison officials could take such as diverting cool air from the guards' pod into the tiers, allowing inmates to access air conditioned areas during their tier time, allowing access to cool showers at least once a day, providing an ample supply of cold drinking water and ice at all times, and supplying personal ice containers and individual fans.  *Ball*, 792 F.3d at 599.  "But in listing those measures, the Fifth Circuit did not hold that those were the only measures necessary to meet the requirements of the Eighth Amendment."  *Cole*, 2017 WL 3049540, at *39.  The Fifth Circuit has determined that a district court's order to air condition Louisiana's death row violated the Prison Litigation Reform Act, which requires courts to fashion remedies that eliminate the constitutional infirmity without

more.  *Ball*, 792 F.3d at 599.  "Because measures short of air conditioning existed but had not

been implemented, the Fifth Circuit found that those injuries could eliminate the injury in a less

intrusive manner than air conditioning."  *Cole*, 2017 WL 3049540, at *39 (citing *Ball*, 792 F.3d

at 599).

Plaintiff seeks preliminary injunctive relief only in the form of transfer to air-conditioned

housing.  (Doc. No. 40, pp. 8-9.)  Plaintiff offered testimony at the evidentiary hearing regarding

his various medical and mental health conditions which allegedly make him susceptible to

excessive heat conditions.  Specifically, Plaintiff testified that:

- Plaintiff suffers from diabetes, hypertension, high cholesterol.  (Doc. No.
  40, p. 9.)

- Plaintiff also suffers from schizophrenia, PTSD, and major depression
  with psychotic features.  *Id.* at 10.

- Plaintiff's diabetes condition makes him particularly susceptible to
  excessive heat conditions.  *Id.* at 10-11.

- Plaintiff takes the blood pressure medication, Amlodipine, which does not
  work well with excessive heat.  *Id.* at 30.

- When Plaintiff is impacted by excessive heat, he suffers many symptoms
  including light-headedness, palpitations, confusion, inability to
  concentrate, dizziness, frequent urination, heat exhaustion, heat cramps,
  fatigue, impaired respiratory system, insomnia, and inability to sweat
  properly.  *Id.* at 11, 14, 29.

- Plaintiff starts feeling one or more of these symptoms when the
  temperature reaches 85 degrees.  *Id.* at 11.

- From April 20, 2023 until the day of the evidentiary hearing on June 29, 2023, Plaintiff described the heat conditions as getting worse to the point where Plaintiff was inhaling hot air.  *Id.* at 27.

- On the day of the hearing, Plaintiff described the conditions in his cell as "[v]ery, very hot." *Id.* at 37.  Plaintiff estimated that his cell was 95 degrees around 2:00 p.m. *Id.* at 39.  On the day of the hearing, Plaintiff indicated, he was suffering heat-related symptoms including heat exhaustion, inability to concentrate or sweat, heat cramps, and palpitations. *Id.* at 38.

While the Court acknowledges Plaintiff's testimony as to his susceptibility to excessive heat, compelling evidence was also presented at the evidentiary hearing to show that various heat-mitigation respite measures were made available to inmates at the McConnell Unit under AD-10.64 and that Plaintiff received the benefit of significant heat mitigation measures, including respite.[3] Defendants submitted into evidence the latest version of AD-10.64 (entitled "Excessive and Extreme Temperature Conditions in TDCJ"), effective May 8, 2020, which was adopted to address extreme temperature conditions in the TDCJ.  (Doc. No. 42).

AD-10.64 includes specific heat mitigation measures that are intended to protect all offenders regardless of their individual risk level.  (Doc. No. 42, pp. 4-6.)  These measures include making respite areas available 24 hours per day, seven days per week, for all offenders who are not assigned to air-conditioned housing.  *Id.* at 6.  Under the policy, offenders may request access to a respite area even if they are not feeling ill at the time of the request and are

---

[3]  In the weeks before and after the June 29 hearing, the South Texas area, including the area where the McConnell Unit is located, had experienced a "pretty stout heat wave."  (Doc. No. 40, p. 29.)

permitted to stay in the respite area as long as necessary." *Id.* In addition, offenders requesting such access "are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness." *Id.*

Pursuant to AD-10.64, drinking water and cups are required to be available to every offender during periods of excessive heat, and hydration is encouraged. (Doc. No. 42, p. 4.) This directive also requires prison units to take extra precautions where the heat index is above 90 degrees, including but not limited to:

- Providing additional water and cups in offender dorms, housing areas, recreational areas, and during meal times, along with ice;

- Transporting psychiatric inpatient offenders to other facilities via air-conditioned transfer vehicles only;

- Transporting offenders during the coolest hours of the day, when possible;

- Allowing offenders to utilize and carry cooling towels;

- Allowing offenders to wear shorts and t-shirts in dayrooms and recreational areas;

- Ensuring maintenance of fans, blowers, and showers in offender housing areas;

- Allowing additional showers for offenders when possible;

- Lowering the water temperature for single temperature showers in offender housing areas;

- Placing posters in housing areas reminding offenders of heat precautions and the importance of water intake, and ensuring all posters that have been damaged or destroyed are replaced; and

- Allowing fans for offenders in all custody levels, to include restrictive housing and disciplinary status, and ensuring the fan program is in place allowing the permanent issuance of fans to indigent offenders.

*Id.* at 7-8.

Pursuant to AD-10.64, wardens at TDCJ units are instructed to implement additional precautions when excessive heat or heat-wave conditions last more than three consecutive days by initiating the Incident Command System.  (Doc. No. 42, p. 8.)  Under these conditions, wardens may restrict and potentially cancel outside work and recreation as well as reduce kitchen and dish room operations as needed.  *Id.*  Offenders are also permitted to purchase "electrolyte sports drinks from the unit commissary without affecting their spending limit."  *Id.*

Under AD-10.64, TDCJ recognizes that "some offenders are potentially at a heightened risk of heat-related illnesses because of their age, health conditions, or medications."  (Doc. No. 42, p. 8.)  Accordingly, AD-10.64 explains that inmates are assessed an automated heat sensitivity score using information from the inmate's medical records and that "[o]ffenders who have a heat sensitivity score receive priority placement in a housing area that is air-conditioned."  *Id.* at 8-9.

AD-10.64 contains additional provisions for first-aid measures in the event of a heat-related illness or injury and features a standardized annual training program that is required at each unit to ensure prevention of injuries due to excessive or extreme temperatures.  (Doc. No. 42, pp. 9-11.)  Training is required for both officers and offenders.  *Id.* at 10-13.  TDCJ staff is required to complete hot weather training annually, no later than April 15 of each year.  *Id.* at 11. Offenders, in connection with their training are provided with an information flyer for heat, cold,

and suicide prevention as well as with "unit-specific heat mitigating measures upon arrival at a new unit." *Id.* at 12.

Warden (now Regional Director) Sanchez confirmed that AD-10.64 (entitled "Excessive and Extreme Temperature Conditions in TDCJ") is implemented at all TDCJ prison units from April 15 through October 30 every year.  (Doc. No. 40, p. 61.)  Under the policy, Warden Sanchez confirmed, prison units are not required to provide respite under AD-10.64 after October 30 through April 15 of the next year, but prison officials retain discretion to provide inmates with respite during this time period.  *Id.* at 62, 67-68.  Warden Sanchez further testified that:

- All offenders, even G5 offenders,[4] are afforded the opportunity for respite under the AD-10.64.  *Id.* at 62.

- If a G5 offender like Plaintiff asks to go to respite, there are areas available for that offender.  *Id.* at 62.

- Inmates are entitled to the following heat mitigations measures: cold showers, permission to purchase two fans, permission to buy electrolytes, permission to buy cold water, and they are afforded cold water.  *Id.* at 63.

- There are no limitations as to how often an inmate can go to respite and how long he can remain in respite.  *Id.* at 64, 74.

---

[4]  Plaintiff testified that he has been classified at the G5 custody level since March 2022.  (Doc. No. 40, p. 41.) This, Plaintiff says, is the most restrictive TDCJ housing classification; Plaintiff indicated that he is confined in his cell 24 hours a day.  *Id.* at 41.

Warden Holmes testified, in turn, that McConnell Unit officers are trained to recognize heat illness and identify respite locations.  (Doc. No. 40, p. 116.)  Expanding on Warden Sanchez's testimony regarding available respite measures, Warden Holmes testified that:

- Fans are located in the day rooms.  *Id.* at 117.

- An offender can have two fans in his cell.  *Id.* at 117.

- Inmates are allowed to carry water bottles or cups everywhere they go. (Doc. No. 40, p. 117.)

- Many areas are available to G5 inmates for air-conditioned respite including: (1) areas in the 12 Building; (2) a holding cell in front of the lower administration building; (3) a legal booth in the lower administration building; (4) a holding cell in the visitation area; and (5) space in other parts of the unit.  *Id.* at 118.

- Additional respite measures available to Plaintiff in the building where he lives (Building 8) include available water coolers in the day room and cold showers.  *Id.* at 119-20.

- Plaintiff may access respite areas when he requests respite.  *Id.* at 117, 138.

In an effort to contradict the testimony regarding readily available respite measures, Plaintiff cites to incidents that allegedly occurred between March 2023 and the date of the evidentiary hearing where officials purportedly denied Plaintiff's requests for respite in the form of transfer to an air-conditioned area.  (Doc. No. 40, pp. 16-17, 25-26, 32-34.)  Plaintiff testified that under AD-10.64:

- An officer is required to alert his or her supervisor about Plaintiff's respite request with the supervisor following up with Plaintiff about his excessive heat concerns.  *Id.* at 20.

- When requesting respite, Plaintiff automatically should be removed from his cell and escorted to an air-conditioned environment.  *Id.*

- Plaintiff generally receives no response from officers regarding his numerous requests for respite.  (Doc. No. 40, pp. 21-22.)

- Plaintiff has been told several times by officers that inmates with a custody level of G5, like Plaintiff, are not entitled to air-conditioned respite.  *Id.* at 32-34.

Plaintiff concedes, however, that from March 2023 until the date of the evidentiary hearing, officers never turned down his requests for respite in the form of cold showers, cold waters, or cold wet rags.  *Id.* at 25.  Plaintiff's testimony further shows that on each of the two days before the evidentiary hearing, he was escorted to an air-conditioned room for a significant amount of time after asking for respite.  *Id.* at 23, 34-35, 45-46.[5]  Lastly, Plaintiff concedes that the Medical Department and the Diabetic Clinic, where Plaintiff gets his insulin shots twice a day, are air-conditioned.  *Id.* at 43-45.

---

[5]  During his closing argument, after all testimony was concluded and the testifying witnesses were excused, Plaintiff claimed for the first time that he did not get air-conditioned respite on the evening before the hearing despite having requested it.  (Doc. No. 40, pp. 144, 146.)  While he received respite earlier that day, Plaintiff stated that his respite request was refused that evening.  *Id.* at 144.  Questioned by the undersigned, Plaintiff claimed he was unable to remember who denied his request for respite.  (Doc. No. 40, pp. 141-43.)  As indicated on the record at the hearing, the undersigned finds this testimony not to be credible.  Plaintiff's eleventh-hour attempt was offered in a last-ditch effort to portray officials as unresponsive to his respite requests – after the time to present evidence was closed – and greatly undermines the credibility of his remaining testimony concerning his claimed lack of respite on other occasions.

The evidence further shows that during the relevant time period from late March though the date of the evidentiary hearing, Plaintiff never sought any medical treatment to address heat-related illnesses or conditions.  Plaintiff testified that, in mid-April, he filed a Step 1 grievance complaining about the excessive heat in his living area, about the lack of reasonable accommodations, and about the lack of wellness checks.  (Doc. No. 40, pp. 13, 25-26.)  While indicating that he filed a sick call request with the medical department around that time, Plaintiff acknowledged that he only sought a medical pass for air-conditioned housing to accommodate his physical disabilities and that he did not seek any kind of medical treatment for heat-related conditions or illnesses.  *Id.* at 14-18.

Objective medical records submitted into evidence show that, on May 30, 2023, Plaintiff was seen by Registered Nurse Georgy Samuel on complaints about the excessive heat that day.  (Doc. No. 42-3, p. 116.)  Rather than seek specific medical treatment for a heat-related illness, Plaintiff requested "a pass specifically for respite."  *Id.*  The nursing clinical note reflects that Plaintiff, who was in no acute distress, was instructed to consult with security regarding respite options under his current custody status.  *Id.*  Upon review of the evidence presented at the evidentiary hearing, Plaintiff has failed to show that the heat-mitigating respite measures in place at the McConnell Unit under AD-10.64 have not been sufficient to protect Plaintiff against a substantial risk of harm.

In addition to the heat mitigation measures deployed at the McConnell Unit, the evidence establishes that Plaintiff enjoys work-related heat restrictions: no work in direct sunlight; no temperature extremes; and no humidity extremes.  (Doc. No. 40, pp. 11-12, 89.)  Warden Holmes stated that Plaintiff is assigned to the so-called medical squad, which does not have to turn out

for work.  *Id.* at 127-28.  Lastly, Warden Holmes confirmed that Plaintiff is on the Heat

Restriction List.  *Id.* at 123, 130; Doc. No. 42-4, p. 2.  Warden Holmes testified:

> The heat restriction list is the list of offenders that could be susceptible to heat.
> They don't have a heat score.  But they have like a possible restriction, or they're
> not being around temperature extremes as far as their work restriction goes.
> Those guys could be susceptible to heat.  They get placed on a heat restriction list.
>
> That's generated.  Medical notifies us that if someone needs to be on the heat
> restriction list.  That list gets placed in the duty post of the officer.  And the
> officer carries that in their clipboard, their pocket, so they can identify and do
> extra checks on those offenders that's housed in that area.

(Doc. No. 40, p. 120.)

With several heat-related precautions in place, Plaintiff has failed to show that he is at

risk of a serious heat-related injury or illness due to having to work in extreme conditions.  The

undersigned acknowledges Plaintiff's concerns about what he considers to be excessive heat

conditions in his living area.  Nevertheless, while Plaintiff's testimony indicates he may have

suffered some heat-related symptoms from time to time since April 2023, the evidence does not

show that Plaintiff ever sought medical treatment for those symptoms or otherwise suffered or is

at risk for suffering a serious heat-related injury.  Because the evidence falls short of satisfying

the objective test for deliberate indifference, Plaintiff fails to show a substantial likelihood of

success as to his Eighth Amendment claim against Dr. Kwarteng.

### b.  Plaintiff has not shown that Dr. Kwarteng acted with deliberate indifference to his health.

"Deliberate indifference is an extremely high standard to meet."  *Domino v. Tex. Dep't of

Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).  To prove the subjective prong of the

deliberate indifference test, the inmate must establish that the prison official "had subjective

knowledge that the inmate faced a substantial risk of harm [to the inmate's health and safety] and

… [consciously] disregarded the risk." *Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021);

*see also Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002).

  A prison official's knowledge of substantial risk may be inferred if the risk was obvious.

*Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).  The Fifth Circuit nevertheless has

"consistently recognized . . . that 'deliberate indifference cannot be inferred merely from a

negligent or even a grossly negligent response to a substantial risk of serious harm.'"  *Dyer v.*

*Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d

447, 458-59 (5th Cir. 2001)); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir.

2021) ("Negligence or even gross negligence is not enough, the officials must have actual

knowledge of the substantial risk").  The Supreme Court further explains that "an official's

failure to alleviate a significant risk that he should have perceived but did not" falls short of

constituting deliberate indifference.  *Farmer*, 511 U.S. at 838.  Deliberate indifference

encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of

humankind.  *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

  Dr. Leonardson, a physician employed by UTMB, provided testimony at the evidentiary

hearing regarding a "heat score," which is calculated for each TDCJ inmate to identify those

inmates at increased risk of injury during excessive heat conditions.  (Doc. No. 40, pp. 48-49.)

She testified as follows:

-  To arrive at an inmate's heat score, there is a set of criteria listing conditions or a combination of conditions.  *Id.* at 49.

-  Medical providers and nurses place an inmate's medical information into the electronic health record, and this information is used by UTMB officials to determine the inmate's heat score.  *Id.* at 50.

- UTMB then electronically transmits an inmate's updated heat score to TDCJ based on the inmate's current medical health information.  *Id.* at 49-51.

- TDCJ officials, therefore, can check to see whether an inmate's Heat Score is zero or a positive number of one or greater.  (Doc. No. 40, p. 51.)

- Medical providers working at the TDCJ prison units have no direct role in calculating the heat score.  *Id.* at 50.

- An inmate's heat score is not placed in his or her medical records.  *Id.* at 51.

- Medical providers at the prison units do not have access to an inmate's heat score.  *Id.* at 51-52.

- Inmates do not know their own heat score.  *Id.* at 52.

- If the medical provider is concerned about an inmate at risk for injury from excessive heat, the provider may contact the Health Services Liaison, consisting of medical personnel employed by TDCJ, to evaluate the inmate's heat-susceptibility risk.  *Id.* at 51-52.

- The Health Services Liaison then transmits an approval to TDCJ that a particular inmate is not getting picked up by the Heat Score algorithm and should be moved to a cool bed.  (Doc. No. 40, p. 52.)

- Medical providers have no authority to order air-conditioned housing for any inmate.  *Id.* at 53.

- The Health Services Liaison, which consists of a group of nurses, is responsible for making requests that a particular inmate be moved to air-conditioned housing.  *Id.* at 53-54.

- Medical providers have input in the process to the extent they can report the risk of heat exposure to a particular inmate and properly report the inmate's medical situation in the chart.  *Id.* at 55.

Defendants submitted into evidence a Heat Scoring Sheet, which details the types of heart, neurologic, psychiatric, mental, and age conditions that would lead to a score of one point for each listed condition or disorder.[6]  (Doc. No. 42-1.)  According to Warden Sanchez, an inmate whose heat score totals one point or higher would receive a recommendation to be placed in air-conditioned housing.  (Doc. No. 40, pp. 70-71.)

Defendants further submitted into evidence Plaintiff's current List of Medical Conditions. (Doc. No. 42-2.)  This list shows that Plaintiff suffers from a number of conditions, including Epilepsy with recurrent seizures, Hyperlipidemia, Type II Diabetes Mellitus, high blood pressure, PTSD, and physical conditions related to his lower leg.  *Id.*  A review of Plaintiff's list of conditions does not reflect that Plaintiff suffers from any physical or mental conditions that would lead to being assessed one point on the Heat Scoring Sheet.  While it is uncontested that Plaintiff suffers from diabetes and high blood pressure, he does not meet the age requirement (65 years old) for either of those conditions to result in a one-point heat score.  (Doc. No. 42-1; Doc. No. 40, p. 70.)

---

[6]  While each of these listed conditions or disorders would lead to a one-point score, inmates who are 75 or older with any other scored criteria would be assigned two points.  (Doc. No. 42-1.)

On the Heat Scoring Sheet, "Schizophrenia" is listed as one of the psychiatric conditions for which a diagnosed inmate would receive a heat score of one point.  (Doc. No. 42-1.) Following the evidentiary hearing, Plaintiff submitted medical records to support his contention that he had been diagnosed with schizophrenia by a free-world psychiatrist and that he continues to suffer from schizophrenia.  *See* Doc. No. 44-3.  Thus, if Plaintiff were diagnosed and recognized by UTMB and TDCJ as having schizophrenia, the Heat Scoring Sheet reflects that he would be entitled to score of one point, leading to a recommendation of transfer to an air-conditioned cell.

Careful review of Plaintiff's free world medical records, however, reveals that he has failed to establish any diagnosis of schizophrenia by a free-world psychiatrist.  *See* Doc. No. 44-3, pp. 1-15.  The records instead reflect a myriad of problems or issues that Plaintiff himself allegedly reported to his medical providers, including the self-reporting of having signs of schizophrenia as well as complaints about having this mental illness.  *Id.*  The undersigned notes that one of Plaintiff's free-world medical records, dated May 21, 2020, references "schizophrenia" with a handwritten check mark[7] and includes the remarks "unspecified" along with "Schizophrenia: Care Instructions."  (Doc. No. 44-3, p. 7.)  However, the undersigned does not find this isolated mention suffices to establish a diagnosis of schizophrenia for purposes of calculating Plaintiff's heat score.

As Defendants point out, the free-world medical record suggesting a schizophrenia diagnosis was dated May 21, 2020, which was more than one year before Plaintiff was taken into custody in October 2021.  Plaintiff has presented no evidence to show that UTMB doctors or TDCJ have ever diagnosed him with schizophrenia, recognized him as being diagnosed with

---

[7]  The source of this handwritten check mark is unknown.

schizophrenia by a free-world practitioner, or otherwise treated him for schizophrenia.  Dr. Kwarteng testified that, upon review of Plaintiff's medical records, he found nothing to indicate that Plaintiff had been diagnosed with schizophrenia or that he had been prescribed medication for schizophrenia.  (Doc. No. 40, p. 78).  According to Dr. Kwarteng, Plaintiff's documented list of conditions does not show a diagnosis of schizophrenia.  *Id.* at 80.

Along with his testimony indicating no knowledge of Plaintiff being diagnosed with schizophrenia, Dr. Kwarteng testified that:

- He has not observed anything in the medical clinic to give him cause to believe Plaintiff was having medical issues as a result of heat conditions in his cell.  (Doc. No. 40, p. 81.)

- Dr. Kwarteng has no role in deciding what heat score to assign to an inmate.  *Id.* at 82-83.

- When an inmate comes to Dr. Kwarteng complaining of dizziness, light-headedness, palpitations, or blurry vision, Dr. Kwarteng provides appropriate medical treatment and prescribes medications which does not include prescribing air-conditioning as medical care.  *Id.* at 83.

- Dr. Kwarteng is not aware of Plaintiff's heat score or any inmate's heat score for that matter.  *Id.* at 85.

- Dr. Kwarteng has never contacted the Health Services Liaison with regard to Plaintiff's case about his housing situation.  *Id.* at 86.

- No reason existed for Dr. Kwarteng to believe, based on his assessment and treatment of Plaintiff, that he needed to seek air-conditioned housing on Plaintiff's behalf.  *Id.* at 86.

- Dr. Kwarteng has not seen any requests by Plaintiff since mid-April 2023 for medical treatment to address heat-related complaints.  (Doc. No. 40, p. 92.)

- Dr. Kwarteng has not treated Plaintiff for any heat-related conditions or illnesses since April 2023.  *Id.* at 93.

- Dr. Kwarteng has seen no medical information or otherwise observed that heat has affected Plaintiff's diabetic condition.  *Id.* at 111.

Dr. Kwarteng confirmed that Plaintiff is currently prescribed the high blood pressure medication Amlodipine and that this medication is listed in the "Correctional Managed Healthcare policy manual as a drug that can cause potentially heat-related problems in patients because it is a drug that can "disrupt[] the body's normal temperature … regulating mechanism." *Id.* at 104-07.  However, according to Dr. Kwarteng, the policy manual does not require that an inmate taking Amlodipine be placed in an air-conditioned environment and may instead benefit from various heat-related measures, such as drinking water and staying cool.  *Id.* at 107-08. Next, while acknowledging that he did not place Plaintiff's current heat restrictions on him, Dr. Kwarteng stated that he did not change or otherwise remove any of these restrictions either.  *Id.* at 88.  The evidence further shows that Dr. Kwarteng has no authority to place Plaintiff on a Heat Restriction List or to order any respite measures, such as placement in an air-conditioned area. *Id.* at 92.

In sum, the evidence presented by the parties fails to show that Dr. Kwarteng refused to treat Plaintiff, ignored his complaints, intentionally treated him incorrectly, or engaged in in any conduct that would clearly evince a wanton disregard to Plaintiff's serious medical needs associated with the excessive heat conditions in his living area.  *See Johnson v. Treen*, 759 F.3d

1236, 1238 (5th Cir. 1985).  The evidence presented falls short of establishing that Dr. Kwarteng had subjective knowledge that Plaintiff faced a substantial risk of harm due to the excessive heat conditions and then consciously disregarded that risk.  *Valentine*, 993 F.3d at 281.  The evidence also shows that Dr. Kwarteng had no authority to direct air-conditioned housing for Plaintiff.  Because Plaintiff fails to satisfy the subjective test for deliberate indifference, it follows that Plaintiff cannot show a substantial likelihood of success as to his Eighth Amendment claim against Dr. Kwarteng.

### 2. *Plaintiff cannot establish a likelihood of success on the merits of his ADA or RA claims.*

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, under the RA, "[n]o qualified individual with a disability . . . shall, solely by reason of her or his such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

"The RA is operationally identical to the ADA in that both statutes prohibit discrimination against disabled persons; however, the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private."  *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 WL 327508, at *3 (N.D. Tex. Jan. 26, 2015) (citing *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)).  Courts utilize the same standards in analyzing claims under both the ADA and RA.  *See Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011).  Therefore, even though Plaintiff has segregated the ADA and RA claims

from one another in his pleadings, the undersigned analyzes his ADA and RA claims as though they were raised in a single claim.  *See Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).

To establish a valid ADA claim, a plaintiff must show that (1) he has a qualifying disability, (2) he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity, and (3) such discrimination is by reason of his disability.  *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018).  A qualifying disability is a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(a)(1).

The definition of "disability" is to be given broad construction.  *See* 42 U.S.C. § 12102(4)(A).  Additionally, to "prevail on a Rehabilitation Act claim, the plaintiff must ultimately prove that the defendant discriminated against him or her solely on the basis of disability."  *Taylor v. City of Shreveport*, 798 F.3d 276, 284 (5th Cir. 2015) (emphasis in original).  To recover monetary damages, more is required: Plaintiff must also show that the discrimination was intentional.  *Miraglia*, 901 F.3d at 574.

A failure to accommodate claim must offer "proof that the disability and its consequential limitations were known by the entity providing public services . . . . Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced . . . as a result of that disability."  *Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 236 (5th Cir. 2017) (citations and quotation marks omitted, emphasis in original). Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances.  *Id.* (citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)).

The burden is on the plaintiff to "'specifically identify the disability and resulting limitations'" to the service provider.  *Windham*, 875 F.3d at 237 (quoting *Taylor*, 93 F.3d at 165).  This is because the ADA "does not require clairvoyance."  *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995).  "[K]nowledge of a disability is different from knowledge of the resulting limitation. And it certainly is different from knowledge of the necessary accommodation." *Windham*, 875 F.3d at 238.  The burden is also on the plaintiff to request an accommodation in direct and specific terms.  *Id.* at 237.  If a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that the disability, the resulting limitation, and the necessary reasonable accommodation all were "open, obvious, and apparent" to the public entity's relevant agents.  *Valentine*, 993 F.3d at 290.

To make out a prima facie failure-to-accommodate claim, Plaintiff must establish as an element of his claim that the entity at issue failed to make reasonable accommodations for his disabilities.  *See Ball*, 792 F.3d at 596 n.9; *Taylor v. Hartley*, 488 F. Supp. 3d 517, 544 (S.D. Tex. 2020) (Eskridge, J.).  As part of this element, a plaintiff must show that he requested reasonable accommodations.  *Frazier v. Wilkie*, No. 4:19-CV-011, 2021 WL 2828246, at *3 (S.D. Tex. June 22, 2021) (Bryan, M.J.) (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007), *adopted*, 2021 WL 2823111, at *1 (S.D. Tex. July 9, 2021).  "In addition, '[a] plaintiff bears the burden of proving the reasonableness of an accommodation in his prima facie case.'"  *Frazier*, 2021 WL 2828246, at *3 (quoting *Jones v. Lubbock Cnty. Hosp. Dist.*, 834 F. App'x 923, 926 (5th Cir. 2020)); *see also Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 618 (5th Cir. 2020) (noting that plaintiff bears the burden to show a requested modification was reasonable).

When determining whether an accommodation is reasonable, courts should consider: "(1) the size, facilities, and resources of the defendant, (2) the nature and cost of an accommodation, (3) the extent to which the accommodation is effective in overcoming the [disability's effects], and (4) whether the accommodation would require a fundamental alteration in the nature of defendant's program." *Frazier*, 2021 2828246, at *3 (citations omitted).  Whether a requested accommodation is reasonable is generally a fact question.  *Id.*

Here, the Court retained Plaintiff's ADA and RA claims against the State and against Dr. Kwarteng, Warden Sanchez, and Director Lumpkin in their official capacities, finding that his allegations were sufficient to state that the excessive heat conditions were more onerous on him due to his particular disabilities.  (Doc. No. 20, pp. 20-21; Doc. No. 27.)  The Court explained:

> Plaintiff's allegations indicate that Dr. Kwarteng and [then-] Warden Sanchez were aware of Plaintiff's vulnerabilities to excessive heat conditions due to his various medical and mental health conditions. … Plaintiff's allegations suggest that the combination of his medical and mental health conditions may have caused him to be more susceptible to excessive heat than other inmates, regardless of their level of sensitivity to such conditions. Further, as alleged by Plaintiff, Dr. Kwarteng and [then-] Warden Sanchez failed to provide Plaintiff with placement in an air-conditioned living area, an accommodation that Plaintiff claims is reasonable to mitigate the risk posed to Plaintiff by the allegedly excessive heat conditions.

(Doc. No. 20, p. 21.)

But even assuming for purposes of the pending motions that Plaintiff is a qualified individual with a disability, Plaintiff has not demonstrated that his requested immediate transfer to an air-conditioned cell is a reasonable accommodation necessary to mitigate the risk to his health by the allegedly excessive heat conditions.  The evidence discussed above shows that Plaintiff has received the benefit of several accommodations in the form of heat mitigation measures in place at the McConnell Unit, work-related heat restrictions placed on Plaintiff, and

placement on the Heat Restriction List whereby officers are required to check on his condition frequently.  (Doc. No. 40, pp. 11-12, 23, 25, 34-35, 45-46, 62-63, 67-68 89, 117-20; Doc. No. 42-4, p. 2.)  Plaintiff presents no evidence to show, with these measures and accommodations already in place, that he suffered any serious heat-related injuries or illnesses requiring medical treatment from April 2023 through the time of the evidentiary hearing to the present.  *See* Doc. No. 40, pp. 14-18; Doc. No. 42-3, p. 116.

The evidence further shows that Plaintiff's individualized Heat Score does not qualify him to be moved to an air-conditioned cell based on his current medical and mental health conditions.  (Doc. No. 40, p. 70; Doc. Nos. 42-1, 42-2.)  On the other hand, allowing Plaintiff to be placed in an air-conditioned cell, even though he did not qualify under the Heat Score policy, would operate to fundamentally alter the nature of the policy giving priority to those inmates most susceptible to excessive heat.  Accordingly, while Plaintiff's allegations were sufficient to state an ADA and RA claim at the pleading stage, the evidence presented at the evidentiary hearing fails to establish a likelihood of success on these claims.

### 3. Plaintiff cannot establish a substantial threat of irreparable harm.

Even assuming Plaintiff could succeed in demonstrating a substantial likelihood of success on the merits of his claims, Plaintiff would also have to carry his burden as to the other three factors in order to merit preliminary injunctive relief.  *See Robinson*, 921 F.3d at 451.  As to the second factor, Plaintiff must show that a failure to grant his requested injunction poses a substantial threat of an irreparable harm.  *Id.*  This means that a concrete and irreparable injury will occur absent the granting of the injunctive relief.  *See Tex. First Nat. Bank v. Wu*, 347 F. Supp. 2d 389, 399 (S.D. Tex. 2004) (Hittner, J.).

As detailed above, while Plaintiff's testimony indicates that he has suffered periodic heat-related symptoms since April 2023, the evidence does not show that he ever sought medical treatment for those symptoms or otherwise suffered or is at risk for suffering a serious heat-related injury. *See* Doc. No. 40, pp. 11, 14-18, 29, 38; Doc. No. 42-3, p. 116.  The evidence shows that Plaintiff has regular access to respite measures such as cold showers and cold water. (Doc. No. 40, p. 25.)  In the days before the evidentiary hearing, Plaintiff's requests for respite in air-conditioned areas of the unit were granted. *Id.* at 23, 34-35, 45-46.  Warden Sanchez and Warden Holmes testified that all inmates, including Plaintiff, who request respite may be taken to a respite area where they can stay as long as they like. *Id.* at 64, 74, 117, 138.  In addition, Plaintiff has access twice a day to air conditioning when he visits the Diabetic Clinic for his insulin shots. *Id.* at 43-45.  Lastly, the evidence shows that Plaintiff has several heat restrictions placed on him, that he is not required to work in the heat at the McConnell Unit at this time, and that he has been placed on the Heat Restriction List whereby officers are required to check on his condition frequently. *Id.* at 11-12, 89, 120, 123 127-28, 130; Doc No. 42-4, p. 2.

With the evidence reflecting that several heat mitigation measures are currently in place at the McConnell Unit and available to Plaintiff, his complaints of irreparable harm due to allegedly excessive heat conditions are speculative at best and fail to show that an irreparable injury is imminent. *See Succession of Roy*, 777 F.2d at 997 ("speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant"); *see also Heath v. City of New Orleans*, 320 F. Supp. 545, 546 (E.D. La. 1970), *aff'd* 435 F.2d 1307 (5th Cir. 1971) (federal court's equitable injunctive power must not be exercised except in exceptional cases to prevent irreparable injury which is clear and imminent).  Accordingly, Plaintiff fails to

demonstrate a substantial threat that he will suffer irreparable injury if his emergency motions for preliminary injunctive relief are denied.

### 4. *Plaintiff fails to satisfy the third or fourth factors.*

As to the third and fourth factors for preliminary injunctive relief, Plaintiff cannot demonstrate that the threatened injury resulting from allegedly excessive heat conditions outweighs the harm to Defendants if the requested injunction were granted, and that granting the injunction would not disserve the public's interest in protecting the health of those inmates at the highest risk for injury from the excessive heat conditions.

"Except in extreme circumstances, federal courts are reluctant to interfere with matters of prison administration and management of inmates." *Mills v. LeBlanc*, No. CV 21-418, 2021 WL 3572148, at *10 (E.D. La. July 15, 2021), *adopted*, 2021 WL 3566434 (E.D. La. Aug. 11, 2021) (citing *Young v. Wainwright*, 449 F.2d 338, 339 (5th Cir. 1971)).  Additionally, "[p]rison administrators are accorded wide-ranging deference in the adoption and execution of policies that in their judgment are needed to preserve internal order and discipline in the daily operations of the prison system." *Renfro v. Baker*, No. CV H-21-2172, 2021 WL 4861802, at *2 (S.D. Tex. Oct. 13, 2021) (Werlein, J.) (citing *Bell v. Wolfish*, 441 U.S. 520, 546- 47 (1979)).

As an initial matter when evaluating the third and fourth factors, the purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits.  *See City of Dallas*, 847 F.3d at 285.  The relief Plaintiff seeks would not "preserve the status quo."  To the contrary, granting the requested injunction would afford Plaintiff relief above and beyond the heat mitigation measures set forth in AD-10.64 already in full effect at the McConnell Unit as well as the purpose of the related Heat Score policy.

Plaintiff's allegations of irreparable harm and the evidence presented at the evidentiary hearing do not indicate violations of his Eighth Amendment, ADA, or RA rights at this stage in the proceedings.  In the absence of such a violation, federal courts are reluctant to interfere in the internal affairs of a state prison system.  *See Richie v. UTMB Hospital Galveston*, No. 2:12-CV-322, 2012 WL 12871940, at *2 (S.D. Tex. Oct. 18, 2012) (Ellington, M.J.) (citing *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988)).  The evidence shows that Plaintiff's individualized Heat Score does not meet the criteria for placing him in air-conditioned cell, which under the applicable TDCJ policies is prioritized for those inmates satisfying the criteria and being in the highest risk category.  (Doc. No. 40, pp. 70-71, Doc. Nos. 42-1, 42-2.)  Any court interference with the McConnell Unit's prison operations and placing Plaintiff in an air-conditioned cell before inmates in the highest risk category would not be in the public's interest.  Plaintiff, therefore, has failed to demonstrate either the third or fourth factors of the preliminary injunctive standard.

### D.  Plaintiff's motions for rehearing on the motion for emergency injunctive relief and for an additional evidentiary hearing should be denied.

On July 19, 2023, after the evidentiary hearing but before the undersigned's issuance of this memorandum and recommendation regarding injunctive relief, Plaintiff filed a motion for a rehearing of his request for emergency injunctive relief.  (Doc. No. 49.)  Plaintiff also filed a motion for an evidentiary hearing as part of his response to a prior Court order.  (Doc. No. 53.)  According to Plaintiff, "The Defendant's failure to get that evidence to the Plaintiff timely has now triggered an additional evidentiary hearing because [t]he Plaintiff could not present his evidence to refute Defendant's evidence."  *Id*. at 1.  Both motions should be denied.

### 1. *Motion for rehearing.*

No provision for a motion for "reconsideration" exists in the Federal Rules of Civil Procedure. *Bass v. United States Dep't. of Agriculture*, 211 F.3d 959, 962 (5th Cir. 2000); *see generally* Fed. R. Civ. P.  If filed within ten days of a court's judgment, such a motion normally is construed as filed pursuant to Rule 59(e).  *See id.*  "The Fifth Circuit has repeatedly held that the purpose of a Rule 59(e) motion is not to rehash arguments that have already been raised before a court." *Palacio v. Grasty*, No. 6:20-CV-40-JDK-KNM, 2021 WL 11472221, at *1 (E.D. Tex. Aug. 10, 2021).

*Bass* and *Palacio* are imperfect analogues to this situation, because no judgment has yet been entered.  But their point still holds true, because Plaintiff's motion for rehearing merely rehashes arguments he has already presented.  This runs contrary to the purpose of Rule 59(e). Because the district court has not yet ruled on Plaintiff's request for injunctive relief, and because Plaintiff's request for rehearing does not raise any new matter, the undersigned recommends that Plaintiff's motion for rehearing (Doc. No. 49) be denied without prejudice as premature.

### 2. *Motion for an additional evidentiary hearing.*

It is within a court's discretion to deny an evidentiary hearing when one would be unnecessary. *See Gittinger v. Ramos*, 372 F. App'x 486, 489 (5th Cir. 2010) (district court did not abuse its discretion when it adopted magistrate judge's recommendation denying plaintiff's request for an evidentiary hearing when there was no need to hold such a hearing).

Here, no additional evidentiary hearing is needed to determine whether Plaintiff should be granted injunctive relief.  The undersigned held an extensive evidentiary hearing that elicited sufficient facts to make a recommendation to the district court.  Although he complains that he

did not have possession of the defendants' exhibits at the time of that hearing, Plaintiff does not explain what further evidence he would present or testimony he would elicit at an additional evidentiary hearing. Plaintiff asserts merely that he "could not present his evidence," *see* Doc. No. 53, p. 1, but in fact he had ample opportunity to do so, and availed himself of that opportunity. The undersigned has considered Plaintiff's additional documentary evidence (Doc. No. 44-3) and considered Plaintiff's arguments relating to that evidence in formulating this memorandum and recommendation. Plaintiff's motion for an additional evidentiary hearing (Doc. No. 53) should be denied without prejudice as unnecessary.

### E. Conclusion and recommendations.

For the reasons set forth above, Plaintiff fails to carry his burden as to any of the four factors required to obtain a preliminary injunction. Accordingly, the undersigned recommends that Plaintiff's first and third motions for emergency injunctive relief (Doc. Nos. 29, 44) be DENIED. In addition, the undersigned recommends that Plaintiff's motion for rehearing (Doc. No. 49) be DENIED without prejudice as premature and that Plaintiff's motion for an additional evidentiary hearing (Doc. No. 53) be DENIED without prejudice as unnecessary.

### F. Notice.

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within 14 days after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), and General Order No. 2002-13, United States District Court for the Southern District of Texas.

A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being

34 / 35

served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

      SIGNED on August 2, 2023.

                MITCHEL NEUROCK
                United States Magistrate Judge